# In the United States Court of Federal Claims

No. 11-725C
(Filed: January 17, 2012)**
**OPINION ORIGINALLY FILED UNDER SEAL ON DECEMBER 22, 2011**

|  |  |  |
|---|---|---|
| | ) | |
| CERADYNE, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Bid Protest; 28 U.S.C. § 1491(b)(1); |
| THE UNITED STATES, | ) | Contract Modification; Competition in |
| | ) | Contracting Act (CICA), 41 U.S.C. § |
| Defendant, | ) | 3301; <u>AT&T Comm'ns v. Wiltel, Inc.</u>, |
| | ) | 1 F.3d 1201 (Fed. Cir. 1993); Claim |
| and | ) | Related to Responsibility |
| | ) | Determination Dismissed as Moot. |
| BAE SYSTEMS AEROSPACE & | ) | |
| DEFENSE GROUP, INC., | ) | |
| | ) | |
| Defendant-Intervenor. | ) | |
| | ) | |

*Michael A. Hordell*, Washington, DC, for plaintiff. *Michael R. Golden, Heather Kilgore Weiner* and *Samuel W. Jack*, Washington, DC, of counsel

*Christopher L. Krafchek,* U.S. Department of Justice, Washington, DC, with whom were *Tony West*, Assistant Attorney General, and *Jeanne E. Davidson*, Director, for defendant. *Sarah M. Bienkowski*, U.S. Department of Justice, Washington, DC and *David H. Scott*, U.S. Army, Office of the Staff Judge Advocate, Aberdeen, MD, of counsel.

*Barbara A. Duncombe*, Dayton, OH, for defendant-intervenor. *Suzanne Sumner, Tricia Bell* and *Casie E. Hollis*, Dayton, OH, of counsel.

**O P I N I O N**

**FIRESTONE**, Judge.

## I.    INTRODUCTION

Pending before the court are the plaintiff, Ceradyne, Inc.'s ("Ceradyne"), the

defendant, United States' ("government"), and the defendant-intervenor, BAE Systems

Aerospace & Defense Group, Inc.'s ("BAE") motions for judgment on the administrative

record in this bid protest action.  Also pending are the government's and BAE's motions

to dismiss.

In September 2010, Ceradyne received an award for a portion of the production of

320,000 X-Side Ballistic Inserts ("XSBI" or "side body armor plates") arising from

Solicitation Number W91CRB-10-R-0082 ("the solicitation").  The XSBI side body

armor plates procured by the Army are designed to protect soldiers from emerging threats

in the field in conjunction with X-Small Arms Protective Inserts ("XSAPI" or "main

body armor plates").  Administrative Record ("AR") 3, 5.  As such, procurement of XSBI

is considered by the Army to be an urgent and compelling need.  Id.

Following the solicitation, the Army awarded a total of five contracts to different

contractors in which each was given an award for different quantities of XSBIs.  Under

the terms of the solicitation, each contract provided that, "[s]hould a contract for a

production quantity be terminated for default, the vendor(s) next in line for award will be

offered the defaulted quantities at the terms proposed."  AR 100.  On November 1, 2011,

Ceradyne filed this action against the government challenging the Army's decision to

modify the contract of another awardee, defendant-intervenor BAE, following the default

of a third awardee.  Under the modification, BAE is to produce an additional 90,000

XSBIs.  The plaintiff argues that the BAE contract modification was an improper sole

source award under the Competition in Contracting Act ("CICA"), 41 U.S.C. § 253

(2006) (current version at 41 U.S.C. §§ 3301-05), and seeks to set the award aside under

the court's bid protest jurisdiction, 28 U.S.C. § 1491(b)(1).[1]

    More specifically, Ceradyne protests the Army's modification of BAE's contract

as outside the scope of the original procurement.[2]   Ceradyne contends that BAE was not

the "next in line" contractor within the terms of the solicitation and therefore the award

should be set aside.  Additionally, the plaintiff protests the Army's initial awards, in

September 2010, alleging that the problems the Army is now facing can be traced to the

Army's failure to conduct a proper responsibility determination of all offerors.  Ceradyne

asks that the Army correct this failure.

    As noted, both the government and BAE seek to dismiss Ceradyne's complaint for

lack of jurisdiction under Rule 12(b)(1) of the Rules of the United States Court of Federal

Claims ("RCFC").  The government and BAE contend that the subject BAE contract

modification was within the scope of the original solicitation and therefore is not subject

---

[1] 28 U.S.C. § 1491(b)(1) provides, in relevant part:

> [T]he Unites States Court of Federal Claims . . . shall have jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement.

Id.

[2] As discussed infra, Ceradyne previously filed a bid protest in this court on May 4, 2011, Ceradyne, Inc. v. United States, No. 11-279C, challenging an earlier decision by the Army to offer other contractors the right to produce XSBIs that a fourth awardee could not produce. Following a settlement of that protest, Ceradyne's contract was modified to provide for the manufacture of an additional 40,000 side body armor plates.

to CICA's competition requirements.  They argue that the court does not have jurisdiction under the bid protest provisions of the Tucker Act to rule on matters of contract administration and that Ceradyne must file a contract claim before it may challenge the Army's decision not to award Ceradyne the "next in line" modification.  They further argue that this court does not have jurisdiction over Ceradyne's objections to the original Army responsibility determination on the grounds that Ceradyne settled that dispute with the Army before the Government Accountability Office ("GAO") and that, therefore, objections to the original responsibility determinations are now moot.[3]  The government and BAE move in the alternative for judgment on the administrative record that the award to BAE of the 90,000 XSBI was based on a reasonable interpretation of the "next in line" language in the solicitation and that the government did in fact perform a proper responsibility determination for each offeror.  Simultaneous briefing was completed on all motions on December 14, 2011.  The court heard oral argument on December 19, 2011.

      For the reasons set forth below, because the court finds that the subject contract modification was within the scope of the original procurement, and because the court finds Ceradyne's claim pertaining to the Army's alleged failure to conduct a proper responsibility determination was the subject of an earlier settlement agreement between Ceradyne and the Army and is therefore moot, the court **GRANTS** the government's and BAE's motions to dismiss.

---

[3] BAE argued in its motion to dismiss that the responsibility claims were barred by laches, but at argument both BAE and the government argued that the claims were moot.

## II.    STATEMENT OF FACTS

### A.    History Leading up to the Subject Solicitation

The history of the BAE contract modification at issue in this case begins in July 2010.  On July 8, 2010, the Chief of the Current and Future Operational War Fighting Capabilities Division for the United States Army ("Army") issued an Operational Needs Statement for XSAPI main body armor plates for the Iraq Joint Operational Area ("IJOA").  AR 1.  In this same memorandum, the Army recognized the need for XSBI side body armor plates to support IJOA forces.  The XSBI were to be sent to forces in the field "as soon as possible."  Id.

That same day, the Army expanded the requirement for the main and side body armor plates to 160,000 sets (320,000 units) "to support the urgent and compelling need identified by in-theater Commanders to remain in front of potential emerging threats" and requested the appropriate program manager to "immediately procure an additional 40,000 XSAPI sets and 160,000 XSBI sets to support fielding as required to Operation Iraqi Freedom and Operation Enduring Freedom."  AR 3.  The amended requirement was intended to allow "the Army to continue providing the best possible protection available for our deployed Soldiers."  Id.

On July 12, 2010, the project manager for the Soldier Protection & Individual Equipment division issued a memorandum requesting approval to immediately purchase 160,000 sets of side body armor plates.  AR 5.  He noted that the Army initially directed the development of the XSAPI main body armor plates in response to a potential new threat.  Id.  Two vendors, BAE and Ceradyne, had been awarded contracts to provide the

240,000 main body armor plates and their contracts were nearing completion.  Id.  After

initially fielding the main body armor, the Army determined an additional need for the

side body armor plates to protect soldiers.  Id.  The estimated cost of the side body armor

procurement was $76.8 million based on a unit price of $240.00.  AR 6.

The Army decided to award contracts for the side body armor plates to BAE and

Ceradyne based upon:  1) their performance on the main body armor; and 2) the fact that

they were the only vendors to have passed a first-article test ("FAT") of their main body

armor design.  Id.  The Army determined that the risk of awarding solely to BAE and

Ceradyne was substantially less than a full and open competition "that would involve

qualifying a vendor or vendors who may not pass a FAT and therefore would be

prohibited from proceeding into production."  Id.

On July 12, 2010, the contracting officer orally requested the Army Principal

Assistant Responsible for Contracting to approve "other than full and open competition"

to award two contracts for 160,000 sets of side body armor to BAE and Ceradyne.  AR 7.

The contracting officer justified her request by stating that "[w]ithout the additional

protection provided by the XSBI insert soldiers will be in imminent danger of injury and

loss of life and Combatant Commanders will not achieve mission objectives."  Id.  The

contracting officer intended to compete the requirement between BAE and Ceradyne and

make two awards, with the majority of the award going to the lowest-priced offeror for its

maximum production capability, and the remainder awarded to the other offeror.  Id.

On August 11, 2010, the contracting officer documented her action in issuing oral

solicitation No. W91CRB-10-R-0082 ("the solicitation") under urgent and compelling

circumstances.[4]  AR 8.  In addition to BAE and Ceradyne, the contracting officer also

contacted The Protective Group, Inc. ("TPG") to participate in the solicitation.  Id.

### B.    The Subject Solicitation

On August 12, 2010, the Army issued the subject solicitation for side body armor

inserts.  AR 10-51.  The solicitation contemplated award of a firm-fixed price ("FFP")

definitive contract and provided that, if selected for award, offerors would deliver 350

side body armor plates within 30 days for FAT, at the Government's expense.  Id.  The

solicitation also explained that the Army had an urgent and compelling requirement for

320,000 side body armor plates to be delivered no later than March 31, 2011.  AR 11.

The solicitation explained that factors to be evaluated were "Price and Delivery."

AR 12.  For the price factor, offerors were required to submit one firm-fixed unit price

for the initial 350 plates for FAT.  Id.  For the 320,000 units, the solicitation stated

offerors "[s]hall propose (1) unit price on a firm fixed priced basis for the quantity

offered.  Offerors may set their own quantity for competition, they do not have to propose

for the entire requirement."  Id.  For the delivery factor, the solicitation required offerors

to propose a delivery schedule for the entire quantity offered with final delivery to be

completed no later than March 31, 2011.  Id.

The basis for award in the solicitation stated that the Army intended to make

multiple awards and all vendors would be awarded their FAT quantity if they proposed

---

[4] "Oral RFPs are authorized when processing a written solicitation would delay the acquisition of supplies or services to the detriment of the Government and a notice is not required under 5.202 (e.g., perishable items and support of contingency operations or other emergency situations)." FAR 15.203(f).

fair and reasonable prices.  Id.  The offeror with the lowest price that was fair and

reasonable and within the required delivery schedule would be awarded their proposed

quantity.  Id.  If the lowest-price offeror proposed a quantity less than 320,000 side body

armor plates, then the next lowest-priced acceptable offeror would be awarded its

proposed quantities, and so on until requirement was met.  AR 12-13.  The solicitation

also included a detailed description of the side body armor inserts.  AR 14-51.

On August 25, 2010, the Army received an unsolicited proposal from

ArmorWorks Enterprises, LLC ("ArmorWorks") for the side body armor plates.  AR 76.

The Army subsequently denied ArmorWorks' request to be considered for the award.

AR 68-74.  On September 3, 2010, ArmorWorks filed a protest with the GAO alleging,

among other things, that the Army failed to issue a proper justification and approval for

the solicitation.  AR 59.  The Army elected to take corrective action in response to this

protest, and on September 8, 2010, amended the solicitation by extending the due date for

proposals and modifying the language in the submission requirement section.  AR 97.[5]

As amended, the solicitation required offerors to "propose one firm fixed unit

price for the entire quantity offered, up to the full quantity of 320,000, based on the

vendor's current monthly available production capacity that can be dedicated to the XSBI

program."  AR 98.  The submission requirements also changed and the solicitation now

required the following:

> Offerors shall propose one (1) unit price on a firm fixed price basis for the
> quantity offered, up to the full 320,000 amount.  Offerors may set their own

_____

[5] In total, the Army issued five amendments to the solicitation.  See AR 52, 93, 139, 142, 146.

quantity for competition; offerors do not have to propose on the entire requirement.  Offerors may submit multiple offers for varying quantities.  Incremental quantities are encouraged, the[] quantities should reflect the current available monthly production capacity that can be dedicated to the XSBI program.  If submitting multiple offers, each proposal shall be clearly delineated.

AR 99.  The solicitation also provided that, in addition to FAT, the Army would conduct quality assurance lot-acceptance testing.  Id.  The amendment modified the basis for award to read as follows:

> Basis of Award:
> a.     All vendors will be awarded up to two (2) FAT quantities if their unit price is determined to be fair and reasonable.  Award of the production quantity will be made to the lowest priced offeror(s) with a fair and reasonable price.  The lowest priced offeror will be awarded their proposed quantity, provided the offeror can meet the required delivery schedule, based on an evaluation by the Government.  If the lowest offeror is for less than the required three hundred and twenty thousand (320,000) XSBI plates, then the next lowest priced acceptable offeror will be awarded their proposed quantities and so on until three hundred and twenty thousand (320,000) XSBI plates are awarded.
> b.     Delivery is considered critical; any vendor who fails FAT or fails to meet the delivery schedules proposed may be terminated for default.  Should a contract for a production quantity be terminated for default, the vendor(s) next in line for award will be offered the defaulted quantities at the terms proposed.

AR 100 (emphasis added).

The Army received proposals from five offerors, ArmorWorks, Armacel, BAE, Ceradyne, and TPG.  AR 147-87.  Ceradyne proposed a maximum quantity of ****.  AR 186.  In its proposal, Ceradyne provided the Army with prices for XSBI Plates based on the volume ordered as follows:

| XSBI Quantity Ordered | Price |
|---|---|
| **** _ **** | **** |
| **** _ **** | **** |

| **** _ **** | **** |
|---|---|
| **** _ **** | **** |
| **** _ **** | **** |
| **** _ **** | **** |

AR 186.  On September 17, 2010, the Army completed evaluation of the five proposals,

concluding that each offeror had submitted a technically acceptable proposal at a fair and

reasonable price.  AR 188-94.   Based upon its analysis, the evaluation team made the

following award recommendation to the contracting officer:

| Vendor | Dec 2010 | Jan 2011 | Feb 2011 | Mar 2011 | Totals |
|---|---|---|---|---|---|
| ArmorWorks | 0 | 20,000 | 34,000 | 36,000 | 90,000 |
| Armacel | 0 | 2,550 | 7,500 | 10,00 | 20,000 |
| BAE | 20,000 | 40,000 | 40,000 | 20,000 | 120,000 |
| TPG | 4,850 | 9,600 | 12,800 | 12,750 | 40,000 |
| Ceradyne | 20,000 | 20,000 | 10,000 | 0 | 50,000 |
| Totals | 44,850 | 92,100 | 104,300 | 78,750 | 320,000 |

AR 188-89.

The evaluation team's recommendation was based upon the risk that BAE might

not be able to **** complete production of its maximum proposed quantity within the

prescribed schedule, and the high risk that Ceradyne would not accept a contract for less

than their minimum proposed quantity, leaving the Army unable to meet the required

timeline.  AR 192, 194.  The evaluation team also assumed that if any other vendor failed

FAT, Ceradyne would be awarded those quantities.  AR 194.

On September 20, 2010, Ceradyne filed a protest at the GAO, B-403983.1, in

which it protested the Army's decision to take corrective action to amend the solicitation

in response to ArmorWorks' protest.  AR 213.

On September 21, 2010, the Chief of the Aberdeen Contracting Division approved

the award of five contracts for side body armor first-article testing and 320,000 side body

armor plates.  AR 196-212.  The contracts were awarded on the same day.  AR 226-893.

Specifically, the Army awarded two first-article testing designs to each offeror and

production quantities as follows:

> Starting with ArmorWorks who proposed the lowest price and acceptable
> delivery schedule through TPG, awards can be made to each offeror for
> their maximum proposed quantity of production as follows:

| Offeror | Maximum Production QTY |
|---------|------------------------|
| ArmorWorks | 90,000 |
| Armacel | 20,000 |
| BAE | 160,000 |
| TPG | 40,000 |
| **Total** | **310,000** |

> The remaining ten thousand (10,000) of the three hundred and twenty
> thousand (320,000) requirement can be awarded to Ceradyne, Inc. who is
> the only offeror remaining after the maximum quantities are awarded to the
> other four (4) offerors.

AR 209.  The Army evaluated each offeror based on the solicitation's two evaluation

factors, price and delivery, and considered the proposals submitted to be fair and

reasonable with acceptable delivery schedules.  AR 201-09.  The contracting officer

addressed the evaluation team's concern ****.  BAE's proposed schedule to meet the

production quantity proposed is considered reasonable."  AR 208.

The Army deemed each awardee a responsible contractor because each possessed

"adequate financial resources to perform the services," "a satisfactory performance

record," and "necessary experience and technical skills" and each was found "qualified to

receive the award under all applicable laws and regulations."  AR 210-11.

On September 23, 2010, the Army debriefed Ceradyne on the final award

decision.  AR 894-900.  Therein, the Army explained its Evaluation Approach as follows:

> Price – Offerors were instructed to propose a firm fixed unit price for both the FAT submittal and the offered production quantity.
>
> Delivery – Offerors were instructed that delivery of FAT was required within thirty (30) days of contract award and proposed production had to be completed by 31 March 2011.

AR 896.  Further, it explained its basis of award:

> Award of the production quantity would be made to the lowest priced offeror(s) with a fair & reasonable price.  The lowest priced offeror would be awarded their proposed quantity, provided the offeror can meet the required delivery schedule.  If the lowest offeror is for less than the required 320,000 XSBI Plates then the next lowest priced acceptable offeror would be awarded their proposed quantities, and so on until 320,000 XSBI Plates are awarded.

AR 897.  The Army stated, "All five (5) offerors submitted production delivery schedules that met the requirements and were considered to be realistic."  AR 898.  For the price evaluation, the Army stated, "All five (5) offerors proposed fixed unit prices for the XSBI production that were determined to be fair and reasonable based on competition and comparison to the IGCE."  AR 899.  The last slide contained the following award results:

| Offeror | Production Quantity | Production Unit Price | Award Value (including FAT) |
|---|---|---|---|
| ArmorWorks | 90,000 | $176.00 | $15,890,865.00 |
| Armacel | 20,000 | $193.00 | $3,918,950.00 |
| BAE Systems | 160,000 | $216.78 | $34,802,254.50 |
| Protective Group | 40,000 | $248.77 | $10,037,350.00 |
| Ceradyne | 10,000 | $259.00[6] | $2,667,700.00 |
| Total | 320,000 | | $67,317,119.50 |

---

[6] The price of $259.00 represented the price proposed by Ceradyne for a quantity of  **** plates.  See AR 186.

AR 900.

On September 27, 2010, Ceradyne filed a second protest with the GAO, alleging that the Army: 1) "improperly failed to evaluate the realism of the offerors' plans to meet the delivery schedule;" 2) "improperly failed to evaluate the offerors' subcontracting plans;"[7] and 3) "failed to consider available and relevant information in making its affirmative responsibility determinations."  AR 913.

On October 6, 2010, the Army and Ceradyne entered into a settlement agreement, which provided that the following language from the solicitation would remain in full force and effect in the contracts awarded to the offerors:

> Delivery is considered critical; any vendor who fails FAT or fails to meet the delivery schedules proposed may be terminated for default.  Should a contract for a production be terminated for default, the vendor(s) next in line for award will be offered the defaulted quantities at the terms proposed.

AR 946 (emphasis added).  The settlement agreement also provided, "[d]uring the time leading up to the performance of the FATs, the Government will conduct a responsibility determination in accordance with FAR 9.103, 9.104-1 through 9.104-4 and 9.104-6."  Id. As a result of the settlement agreement, Ceradyne withdrew its bid protests.  AR 947-48.

On October 22, 2010, the contracting officer submitted a justification and request for approval to procure 320,000 side body armor plates "on an other than full and open competition basis pursuant to the authority of 10 U.S.C. [§] 2304(c), FAR 6.302-2,

---

[7] On September 9, 2010, the solicitation was amended to require large business offerors to submit a subcontracting plan that addressed the offerors' small business goals and incorporated questions and answers from the prospective offerors.  AR 139-41.  On September 20, 2010, the contracting officer waived the requirement for subcontracting plans for the solicitation based upon the offerors' inability to subcontract out the requirements.  AR 195.

unusual and compelling urgency" to the Army Principal Assistant Responsible for

Contracting ("PARC").  AR 950-56.  The PARC approved the request on November 12,

2010.  AR 957.

On January 7, 2011, Ceradyne filed a protest with the Army in which it asserted

that the Army was not implementing the corrective action promised by the Army in the

settlement agreement.  AR 958-65.  Ceradyne requested that the Army terminate the

contract of the awardee it alleged had failed the FAT, and award that quantity to

Ceradyne.  Id.

On January 13, 2011, the Army responded that it was proceeding with the FAT,

that no awardee had yet failed both FAT submittals permitted by the solicitation ground

rules, and that should any firm fail FAT, "we intend to award any defaulted quantities in

accordance with the ground rules outlined in the original Solicitation."  AR 966.  The

Army also stated that "the responsibility assessments agreed to in the Settlement

Agreement are ongoing.  The Government does not intend to issue any FAT approval

letter until after completion of a thorough responsibility determination."  AR 966-67.

From January 24 through February 7, 2011, the contracting officer conducted a

second responsibility analysis and determination for BAE, ArmorWorks, Armacel, and

Ceradyne.  AR 968-73, 978-92, 993-1010, 1019-28.  For each contractor, the contracting

officer provided "documentation and determination of contractor responsibility" based on

the seven standards identified in FAR 9.104-1 (adequate financial resources; compliance

with required or proposed delivery schedule; satisfactory performance record;

satisfactory record of integrity and business ethics; necessary organization, experience,

accounting and operational controls, and technical skills; necessary production and technical equipment; and be otherwise qualified and eligible under applicable laws and regulations). Id.

From January 31 through April 11, 2011, the Army conducted first-article testing and approved some of the designs for side body armor submitted by ArmorWorks, Armacel, BAE, and Ceradyne for full production, subject to further lot-acceptance testing. AR 974-77, 1011-14, 1015-18, 1029-32, 1033-36, 1043-46, 1057-60.

On February 24, and again on February 25, 2011, the Army notified TPG that its two designs for side body armor had failed FAT and, therefore, full production was not authorized. AR 1037-40. The contracting officer then terminated TPG's contract for default on March 2, 2011. AR 1041-42.

On March 14, 2011, the Army notified ArmorWorks that one of its two designs for side body armor, design code 1153-0, had failed FAT and, therefore, production was not authorized. AR 1050-51.

On March 16, 2011, the Army notified Armacel that one of its two designs for side body armor, design code STG, had failed FAT and, therefore, production was not authorized. AR 1052-53.

## C.   Ceradyne's First Court of Federal Claims Bid Protest

Once FAT was completed, the four remaining contractors began performance and production of the side body armor plates and the Army commenced lot-acceptance testing. During this phase of performance, ArmorWorks' design 1171-1 was failing the Army's lot-acceptance testing. AR 1082. Following review of ArmorWorks' Failure

Analysis Corrective Action Report ("FACAR"), on April 25, 2011, the Army recommended that ArmorWorks submit a new design and advised that if it did not do so, and if the design 1171.1 continued to fail, the first-article testing letter would be cancelled due to a pattern of negative trending.  AR 1083.  On April 28, 2011, the Army and ArmorWorks reached an agreement to resolve the lot-acceptance testing failures of design 1171.1.  AR 1084.

On April 5, 2011, Ceradyne submitted a letter to the Army requesting award of the defaulted quantity, 40,000 side body armor plates, formerly awarded to TPG, and asserting that it was in line for the award.  AR 1055-56.  The contracting officer responded to Ceradyne's letter on April 19, 2011 as follows:

> As was originally conveyed to Ceradyne in our letter dated January 13, 2011, should any firm fail FAT, we intend to award any defaulted quantities in accordance with the ground rules outlined in the original solicitation.  Those ground rules state that should a contract for a production quantity be terminated for default, the vendor(s) next in line for award will be offered the defaulted quantities at the terms proposed. Maximum capacity was not a consideration in the original Request for Proposal (RFP).  The RFP provided for multiple awards and authorized offerors to submit multiple offers.  As the basis for award in the RFP was low price with a defined delivery schedule, we will offer any defaulted quantity to the lowest cost offeror who is willing and able to deliver the defaulted quantity within the RFP specified delivery period.  If the low offeror is not willing to deliver the entire defaulted quantity at their existing contract price and within the RFP delivery period, the same offer will be made to the next low awardee until we are able to effect award of the defaulted quantity.  This process comports with the terms of the original RFP, meets the Government's requirement to mitigate excess cost of reprocurement and maximizes the price benefit to the Government.).

AR 1061 (emphasis added).  On April 25, 2011, Ceradyne responded to the Army's April 19, 2011 letter, again requested the defaulted quantity, and attached a draft GAO protest.

- 16 -

AR 1062-81.  On April 28, 2011, the contracting officer responded to Ceradyne's April 25, 2011 letter.  AR 1086.  The contracting officer reiterated that the Army's intent "to award any defaulted quantities in accordance with the ground rules outlined in the original solicitation," and that the "ground rules stated that should a contract for production quantity be terminated for default, the vendor(s) next in line for award will be offered the defaulted quantities at the terms proposed, [and the Army considers] 'next in line' to be that offeror, limited to the price originally bid and the RFP required delivery schedule, who offers the lowest price."  Id.  The contracting officer then went on to explain that due to "problems arising during contract administration with the next in line [which] have created an unacceptably high risk of product failure . . . . [the Army does] not consider award to the next in line, allowing that company to assume the risk of default, to be an acceptable approach."  Id.  Based on this rationale, the Government explained its intent to reprocure the defaulted quantities of TPG's XSBI contract using full and open procedures amongst the remaining approved vendors.  Id.  The Army further stated that "[t]his process meets the Government's requirement to mitigate excess cost of reprocurement, gives all eligible competitors a fair opportunity to win award, and maximizes the price benefit to the Government."  Id.

On May 4, 2011, Ceradyne filed a bid protest with this Court, Ceradyne, Inc. v United States, No. 11-279C.  Following an initial status conference and settlement discussions, the contracting officer decided not to conduct an open competition among the four remaining awardees but to modify Ceradyne's contract to include the 40,000 defaulted quantities of XSBI formerly awarded to TPG.  AR 1088.  The contracting

officer based her decision upon the fact that "delivery of the defaulted XSBI quantities is still considered urgent and compelling because the XSBI are needed to support members of the United States Armed Forces deployed to hostile regions, such as Iraq and Afghanistan" and because "Ceradyne [was] the only awardee that can efficiently and quickly provide the defaulted forty thousand (40,000) XSBI plates within the scope of its stated current production capacity within the requested production schedule." Id.

On May 17, 2011, Ceradyne proposed a delivery schedule, AR 1089, and on May 18, 2011, the Army issued a bilateral modification to Ceradyne's existing contract to include the defaulted quantity at Ceradyne's proposed delivery schedule, AR 1090-93.

### D.    The Present Dispute

On June 17, 2011, the Army issued a show cause letter to ArmorWorks, requesting the contractor to explain why its contract should not be terminated for default due to continued failure of its side body armor plates in lot-acceptance testing.  AR 1102.  On June 24, 2011, ArmorWorks responded in a letter, in which it attempted to explain why the performance failures were excusable.  AR 1103-05.  On July 20, 2011, the Army responded that no viable defense had been offered by ArmorWorks in regards to terminating its XSBI contract for default, but that because the "XSBI program is still a critically needed item and in order to avoid further delays with a termination for default," the Army would allow ArmorWorks to present a third design for FAT at ArmorWorks' expense, subject to certain conditions.  AR 1106-07.  ArmorWorks agreed to the proposed settlement on July 29, 2011.  AR 1107.

On July 22, 2011, Ceradyne requested and received a one-month extension of the

delivery schedule for the 40,000 plates it had been awarded on May 18, 2011.  AR 1153, 1158.

On September 21, 2011, the Army sent a letter to ArmorWorks advising that "[d]ue to the uncertainty of design 1171.1 . . . ArmorWorks' XSBI design 1171.1 is hereby invalidated by the Government and First Article Test (FAT) approval dated 31 January 2011 for this design is revoked.  Production of design 1171.1 is no longer authorized."  AR 1108.

On October 5, 2011, the Contracting Officer also signed a Memorandum for Record discussing the determination to terminate ArmorWorks' contract for 90,000 plates for default.  AR 1111.  On October 7, 2011, the Army issued Modification P00005 to ArmorWorks contract terminating the contract for default.  AR 1115.  On October 18, 2011, ArmorWorks sent a letter to the Army requesting a conference to discuss the termination for default.  AR 1117.  On October 24, 2011, the Army reaffirmed the termination for default of ArmorWorks' contract, stating: "The default stands as originally issued."  AR 1121.

The Army decided to offer the 90,000 defaulted XSBI plates first to Armacel at the rate of $193 per plate, second to BAE at $216.78 per plate, and third to Ceradyne at **** per plate.  AR 1113.  Because the contractors were "all nearing completion, or ha[d] already completed their initial production requirement as awarded under the original contracts," the Army determined capacity was no longer an issue and "next in line as defined by the Government divert[ed] to price."  Id. (emphasis added).  The Army contacted Armacel on October 18, 2011, to offer it the right to produce the defaulted

quantity; Armacel declined the offer.  Id.

On October 19, 2011, Ceradyne, through Marc A. King, President, Ceradyne

Armor Systems, Inc. and Vice President, Ceradyne, Inc., sent an email to Carol Tyree,

Contracting Officer, advising that it had come to Ceradyne's attention through vendor

discussions at the Association of the United States Exhibition that ArmorWorks had been

terminated for default concerning its XSBI contract for 90,000 XSBI plates.  AR 1152.

Mr. King took the position that Ceradyne is the next vendor in line under its XSBI

Contract (W91CRB-10-C-0313) and asked when Ceradyne could expect the award of the

90,000 XSBI plates.  Id.

On October 25, 2011 the Army contacted BAE to offer it the defaulted quantity.

Id.  Later that day, BAE accepted the Army's offer.  AR 1124-25.  The resulting

repurchase increased the Army's costs by $3,670,302.18, which the Army anticipated

would be reimbursed by ArmorWorks.  AR 1129.  On November 2, 2011, the Army

issued a bilateral modification to BAE's contract and increased the total number of side

body armor plates by 90,000.  AR 1132-37.  BAE is anticipated to complete delivery by

February 26, 2012.  AR 1136.

## III.   STANDARDS OF REVIEW

### A.   Dismissal for Lack of Jurisdiction

Pursuant to RCFC 12(b)(1), the plaintiff bears the burden of establishing subject

matter jurisdiction, Alder Terrace, Inc. v. United States, 161 F.3d 1372, 1377 (Fed. Cir.

1998) (citing McNutt v. General Motors, 298 U.S. 178, 189 (1936)), and must do so by a

preponderance of the evidence, Reynolds v. Army & Air Force Exch. Serv., 846 F.2d

746, 748 (Fed. Cir. 1988).  Because jurisdiction is a threshold matter, a case can proceed

no further if a court lacks jurisdiction to hear it.  See Arbaugh v. Y & H Corp., 546 U.S.

500, 514 (2006) ("[W]hen a federal court concludes that it lacks subject-matter

jurisdiction, the court must dismiss the complaint in its entirety." (citation omitted));

Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 94 (1998).  See generally John R.

Sand & Gravel Co. v. United States, 552 U.S. 130 (2008).

When a party has moved to dismiss for lack of subject matter jurisdiction, the

alleged facts in the complaint are viewed as true.  Pixton v. B & B Plastics, Inc., 291 F.3d

1324, 1326 (Fed. Cir. 2002) (citing Scheuer v. Rhodes, 416 U.S. 232, 236 (1974)); see

also N. Hartland, L.L.C. v. United States, 309 F. App'x 389, 392 (Fed. Cir. 2009) (the

court "takes the allegations in the pleadings as true and construes them in the light most

favorable to the complainant").  When a court considers a motion to dismiss for lack of

subject matter jurisdiction, it may look beyond the pleadings and "inquire into

jurisdictional facts" to determine whether jurisdiction exists.  Rocovich v. United States,

933 F.2d 991, 993 (Fed. Cir. 1991).

## B.      Judgment on the Administrative Record

RCFC 52.1 provides for review based on the administrative record.  Under RCFC

52.1, the court determines whether, given all the disputed and undisputed facts, a party

has met its burden of proof based on the evidence in the record.  Bannum, Inc. v. United

States, 404 F.3d 1346, 1356 (Fed. Cir. 2005).

The Federal Circuit has held that the proper standard to be applied in claims

brought under 28 U.S.C. § 1491(b)(1) is provided by the Administrative Procedure Act, 5

U.S.C. § 706(2)(A) (2006): "a reviewing court shall set aside the agency action if it is

'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'"

Banknote Corp. of Am. v. United States, 365 F.3d 1345, 1350-51 (Fed. Cir. 2004)

(quoting 5 U.S.C. § 706(2)(A); citing Advanced Data Concepts, Inc. v. United States, 216

F.3d 1054, 1057-58 (Fed. Cir. 2000)); 28 U.S.C. § 1491(b)(4).  Under this standard, a

procurement decision may be set aside if either:

> (1) the procurement official's decision lacked a rational basis; or (2) the
> procurement procedure involved a violation of regulation or procedure. A
> court evaluating a challenge on the first ground must determine whether the
> contracting agency provided a coherent and reasonable explanation of its
> exercise of discretion. When a challenge is brought on the second ground,
> the disappointed bidder must show a clear and prejudicial violation of
> applicable statutes or regulations.

Axiom Res. Mgmt., Inc. v. United States, 564 F.3d 1374, 1381 (Fed. Cir. 2009) (quoting

Impresa Construzioni Geom. Domenici Garufi v. United States, 238 F.3d 1324, 1332-33

(Fed. Cir. 2001)) (internal quotation omitted).  "The scope of review under the 'arbitrary

and capricious' standard is narrow and a court is not to substitute its judgment for that of

the agency." Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co., 463 U.S. 29,

43 (1983); Ala. Aircraft Indus., Inc.-Birmingham v. United States, 586 F.3d 1372, 1375

(Fed. Cir. 2009).

## IV.  DISCUSSION

### A.    Motions to Dismiss

**1.    The plaintiff's challenge to the modification of BAE's contract
under the court's bid protest jurisdiction must be dismissed on
the grounds that BAE's contract as modified does not materially
depart from the scope of the original procurement.**

Ceradyne contends that the award to BAE of the defaulted quantities amounts to an improper sole source award in violation of CICA because the award was outside the scope of the original XSBI solicitation and did not meet the requirements for a non-competitive award under CICA. Specifically, Ceradyne argues that under the terms of the original solicitation, the award of defaulted quantities was to go to the contractor that was "next in line" and BAE was not the next in line contractor. Rather, Ceradyne maintains that under the terms of the solicitation either it was the next in line contractor as the one contractor which had not been given its full production request or an open competition was required. Ceradyne argues that the Army's modification of BAE's contract, awarding BAE the defaulted quantity at the price originally proposed by BAE, was outside the scope of the original procurement because it significantly increased the number of XSBIs that BAE initially agreed to produce within the time prescribed for production by the Army. In addition, Ceradyne argues that BAE's costs for the 90,000 XSBIs was far more than initially awarded by the government to the original contractor. In such circumstances, Ceradyne argues, the modification was not within the scope of the original solicitation and thus the award to BAE was an improper sole source award and must be set aside.

The government and BAE argue in opposition that the BAE contract modification was within the scope of the original solicitation and procurement, because (1) the contract was modified to produce precisely the same XSBI side body armor plates as described in the original solicitation and (2) because the solicitation explicitly provided for award of any defaulted quantities without a new full and open competition. The government and

BAE also argue, on the merits, that the solicitation did not limit the award of defaulted

quantities to only those contractors with excess capacity at the time of the award (i.e.

Ceradyne), but contemplated that the "next in line" award would be based on the facts

and circumstances present at the time of any default.  Here, because at that time of the

90,000 unit default, all of the non-defaulted awardees had neared full completion of

production, they argue that capacity was not the most relevant factor.  Rather, they claim

that the Army reasonably determined that price was the most relevant factor in

determining the "vendor(s) next in line for award."[8]  The court agrees with the

---

[8] The government further argues that Ceradyne's challenge to the government's interpretation of "next in line" must be dismissed on the grounds that to the extent the language was ambiguous in the solicitation, Ceradyne should have challenged the meaning of the phrase earlier.  The government contends that the challenge to the meaning of "next in line" has been waived under Federal Circuit precedent in Blue & Gold Fleet, L.P. v. United States, 492 F.3d 1308 (Fed. Cir. 2007).  Because the court finds that the contract modification at issue in this dispute was within the scope of the original procurement, it does not reach this issue.

The government also invites the court to dismiss this case upon grounds of national defense and national security, based upon the government's contention that the procurements involve "mission critical" or "mission essential" equipment necessary for the safety of soldiers in the field.  The government argues that pursuant to 28 U.S.C. § 1491(b)(3) ("In excercising jurisdiction under this subsection, the courts shall give due regard to the interests of national defense and national security and the need for expeditious resolution of the action."), the court has discretion to voluntarily refrain from exercising jurisdiction over this matter, regardless of any other facts at issue in the merits.  The plaintiff argues that the government is wrong to suggest that national security interests alone may be a basis for denying a claimant of bid protest jurisdiction before the court, and that such concerns are only properly raised in the context of evaluating whether or not to grant injunctive relief to a successful claimant.  Because the court finds that the contract modification at issue in this dispute was within the scope of the original procurement, it does not reach this issue.

BAE further challenges Ceradyne's standing to bring a bid protest as a contract awardee.  As a matter of law, an awardee of a contract is barred from challenging the administration of its own contract under the court's bid protest jurisdiction; such matters can be challenged, if at all, only under the Contract Disputes Act ("CDA"), 41 U.S.C. §§ 7101-09 (previously codified at 41 U.S.C. §§ 601-13 (2006)).  Outdoor Venture Corp. v. United States, 100 Fed. Cl. 146, 152-53 (2011) (citing 41 U.S.C. § 7103(g) (stating that a contracting officer's decision on a claim is "not

defendants that this court does not have jurisdiction under its bid protest authority to consider the modification award to BAE.

Under its bid protest authority, this court may "render judgment on an action by an interested party objecting to . . . any alleged violation of statute or regulation in connection with a procurement or a proposed procurement."  28 U.S.C. § 1491(b)(1). While the phrase "in connection with a procurement or a proposed procurement" is "very sweeping in scope," Distributed Solutions, Inc. v. United States, 539 F.3d 1340, 1345 (Fed. Cir. 2008) (quoting RAMCOR Servs. Group, Inc. v. United States, 185 F.3d 1286, 1289 (Fed. Cir. 1999)), it is not without limit.  Here, the plaintiff has invoked the court's bid protest jurisdiction on the grounds that modification of BAE's contract is an unlawful sole source procurement in violation of CICA's requirement for "full and open competition through the use of competitive procedures."  41 U.S.C. § 3301(a)(1) (formerly 41 U.S.C. § 253(a)(1)(A)).  The Federal Circuit has made plain that whether such a claim fits within the court's bid protest jurisdiction turns on "whether the modification is within the scope of the competition conducted to achieve the original contract."  AT & T Comm'ns v. Wiltel, Inc., 1 F.3d 1201, 1204-05 (Fed. Cir. 1993).[9]  If

_____

subject to review by any forum, tribunal, or Federal Government agency" except as provided by the CDA)); see also Dalton v. Sherwood Van Lines, Inc., 50 F.3d 1014, 1017 (Fed. Cir. 1995) ("When the [CDA] applies, it provides the exclusive mechanism for dispute resolution; the [CDA] was not designed to serve as an alternative administrative remedy, available at the contractor's option." (citations omitted));  Cecile Indus., Inc. v. Cheney, 995 F.2d 1052, 1055 (Fed. Cir. 1993) ("The CDA exclusively governs Government contracts and Government contract disputes.") (citing Cascade Pac. Int'l v. United States, 773 F.2d 287, 296 (Fed. Cir. 1985)).  However, because the court finds that the disputed contract modification at issue in this case is the modification to BAE's contract, and not the failure to modify Ceradyne's contract, it does not reach this issue.

[9] In creating this test, the Federal Circuit looked to the "cardinal change" doctrine by analogy.

the modification materially departs from the scope, then a new competition may be required and jurisdiction will stand.  If the modification was, however, within the scope of the solicitation, the protest must be dismissed.  Id.; Distributed Solutions, 539 F.3d at 1346 ("adding work to an existing contract that is clearly within the scope of the contract does not raise a viable protest under § 1491(b)(1)").

This court has looked to a variety of factors to determine whether a contract, as modified, materially departs from the scope of the original procurement.  Courts look to "whether the solicitation for the original contract adequately advised offerors of the potential for the type of changes during the course of the contract that in fact occurred, or whether the modification is of a nature which potential offerors would reasonably have anticipated."  AT & T, 1 F.3d at 1207 (quoting Neil R. Gross & Co., 69 Comp. Gen. 247 (1990)).  Courts will also examine whether the modification substantially changes the type of product or service being delivered or performed, the quantity of the product or service, the performance period, and the costs as between the original contract and modified contract.  See Cardinal Maint. Serv., 63 Fed. Cl. at 106-07; Northrop Grumman Corp. v. United States, 50 Fed. Cl. 443, 466 (2001).  Thus, if the court concludes as a matter of law that the modification was contemplated in the original procurement and the type of work, quantity, performance period, and costs have not substantially changed, CICA is not implicated and the protest must be dismissed.  See AT & T., 1 F.3d at 1208; Distributed Solutions, 539 F.3d at 1346.  In this case, these factors weigh in favor of

---

AT & T, 1 F.3d at 1205.  The cardinal change doctrine prohibits the government from forcing contractors to undertake tasks that were not within the scope of their original contract.  Id.; Cardinal Maint. Serv., Inc. v. United States, 63 Fed. Cl. 98, 106 (2004).

dismissal.

While the procurement history in this case is lengthy and complicated, the basic facts pertaining to the scope of the original procurement and subsequent contract modification at issue are relatively straight forward.  Both Ceradyne and BAE were among a group of five offerors awarded contracts to produce a total of 320,000 side body armor plates ("XSBI") for the Army under solicitation No. W91CRB-10-R-0082 ("the solicitation") on the basis of price and delivery (offerors were to propose a schedule for final delivery of the quantity offered no later than March 31, 2011).  The specifications of the XSBI were described in the solicitation.  Pursuant to the terms of the solicitation[10] the first four awardees based on price (the lowest priced offeror(s) with a fair and reasonable price), including BAE, received an award for their maximum quantity of XSBI offered.  Ceradyne, the fifth offeror and the last based on price, received an award of the remaining 10,000 XSBI out of its maximum quantity offered of ****.

As noted, from the outset the solicitation contained the following provision for re-award of defaulted quantities:

Delivery is considered critical; any vendor who fails FAT or fails to meet

---

[10] The solicitation included the following basis of award:

Award of the production quantity will be made to the lowest priced offeror(s) with a fair and reasonable price.  The lowest priced offeror will be awarded their proposed quantity, provided the offeror can meet the required delivery schedule, based on an evaluation by the Government.  If the lowest offeror is for less than the required three hundred and twenty thousand (320,000) XSBI Plates, then the next lowest priced acceptable offeror will be awarded their proposed quantities and so on until three hundred and twenty thousand (320,000) XSBI Plates are awarded.

AR 100.

the delivery schedules proposed may be terminated for default.  Should a contract for a production quantity be terminated for default, the vendor(s) next in line for award will be offered the defaulted quantities at the terms proposed.

AR 100.  When the low price awardee, ArmorWorks, defaulted on its contract to produce 90,000 XSBI, the Army offered the defaulted quantity to BAE, as the third-price awardee, only after first offering the defaulted quantity to the second-price awardee, Armacel.  BAE accepted the offer, and the Army modified BAE's existing contract to include the defaulted quantity.

Ceradyne's argument that the BAE modification was a material departure from the scope of the original competition must be rejected.  First, in contrast to cases finding a substantial change, the Army here did not have to alter any of the terms of the original procurement, including the overall ceiling quantity of 320,000 XSBI, to effect the contract modification.  BAE's contract, as modified, was identical to BAE's prior contract awarded under the original procurement with the exception of the additional 90,000 side body armor plates.  The side body armor plates were otherwise to be produced to the same specifications, at the same reasonable unit price, in the same period of time.[11]

Second, the award of additional XSBIs to BAE up to the total 320,000 was contemplated by the solicitation and thus the BAE modification could have been reasonably anticipated by the offerors.  The solicitation clearly provided for an award to any of the vendors up to 320,000 XSBI as well as the modification of contracts should

---

[11] It is for these reasons that the plaintiff's reliance on <u>Cardinal Maint. Serv. v. United States</u>, 63 Fed. Cl. 98 (2004), is misplaced.

one of the awardees default on their original quantities.  All of the offerors, including

BAE and Ceradyne, therefore knew or reasonably should have known that they could be

one of the vendors authorized to receive a "next in line" award under the solicitation until

all 320,000 units were produced.  Thus, the solicitation contemplated that bidders might

well be asked to produce substantially more XSBIs than they were awarded if one of the

awardees later defaulted.  The modification of BAE's contract to complete the 90,000

XSBIs was not out of scope of the original contract simply because it involved the

production of more XSBIs by an individual vendor.  Further, there was nothing in the

solicitation to suggest that the decision to award to the next in line was to be based solely

on the stated capacity of an awardee at the time of initial award – rather than at the time

of a future default.  Contrary to Ceradyne's contentions, the next in line decision would

necessarily require an evaluation of capacity at the time of the default, because it would

not be clear until a default which of the remaining contractors could meet the Army's

need.

       For all of these reasons, the court finds that BAE's contract as modified did not

materially depart from the scope of the original procurement.  Therefore under the test

laid out by the Federal Circuit in AT & T, the protest of the Army's modification of the

BAE contract must be dismissed.

              **2.     The plaintiff's claim that the Army failed to conduct a proper
                       responsibility determination in the original procurement should
                       be dismissed as moot.**

       The plaintiff also protests the Army's initial award, in September 2010, alleging

that the Army failed to conduct a proper responsibility determination of all offerors

consistent with the FAR,[12] which resulted in Ceradyne initially receiving an award of a smaller quantity of XSBI than it would have been in line to receive if a proper responsibility determination had been made. In asking the court to re-open the Army's original September 2010 procurement decision, after more than thirteen months, the plaintiff argues that if the contracting officer had performed a proper responsibility determination, then Ceradyne would have received an initial award of at least 50,000 plates rather than 10,000. Pl.'s Br. 35-36. The government and BAE argue in response that this portion of the claim has previously been argued and resolved through settlement of Ceradyne's protests before the GAO and they move to dismiss this portion of the plaintiff's bid protest as moot. The court agrees with the defendants.

The plaintiff first made this same argument in its September 27, 2010 protest before the GAO, where, in the plaintiff's own words:

> Ceradyne argued that the Army did not conduct its evaluation consistent with the Solicitation ground rules. Ceradyne primarily argued that the Army improperly failed to evaluate the realism of offerors' plans to meet the delivery schedule as required by the Solicitation and that the Army failed to consider available relevant information in making its affirmative responsibility determinations. Ceradyne argued that, under a proper evaluation, it would have received additional plates in its award. Rather than defend the protest, the Army discussed with Ceradyne's counsel the possibility of a settlement.

Compl. ¶¶ 31-32 (internal citations omitted). These discussions led to an October 6, 2010

---

[12] For example, FAR 9.103 provides: "purchases shall be made from, and contracts shall be awarded to responsible prospective contractors only . . . [n]o purchase or award shall be made unless the contracting officer makes an affirmative determination of responsibility." Id.

settlement agreement that resulted in Ceradyne withdrawing its two protests[13] at the

GAO, on October 7, 2010, based on the settlement agreement.  Id. ¶ 32; AR 946-49.  The

settlement agreement stated, in part, that "[d]uring the time period leading up to the

performance of the FATs, the Government will conduct a responsibility determination in

accordance with FAR 9.103, 9.104-1 through 9.104-4 and 9.104-6."  Compl. ¶ 33; AR

946.

        It is clear on the facts alleged and illuminated in the record that the plaintiff

previously brought and settled this identical dispute in a prior action against the

government.  Rather than pursue its claim in front of the GAO, plaintiff chose as its relief

a bargained for exchange, as memorialized in the October 6, 2010 settlement agreement.

By virtue of this settlement agreement, the plaintiff has rendered moot any bid protest

claim it may have had based upon the government's alleged failure to perform a

responsibility determination in compliance with the FAR.  See Kimberly-Clark Corp. v.

Proctor & Gamble Distrib. Co., 973 F.2d 911, 914 (Fed. Cir. 1992) ("Generally,

settlement of a dispute does render a case moot.") (citing Local No. 8-6, Oil, Chem. &

Atomic Workers Int'l Union v. Missouri, 361 U.S. 363, 368-69 (1960)); Gould v. Control

Laser Corp., 866 F.2d 1391, 1392 (Fed. Cir. 1989) ("Settlement moots an action.") (citing

---

[13] As discussed supra, Ceradyne filed two protests before the GAO in September 2010.  On
September 20, 2010, Ceradyne filed a protest at the GAO, B-403983.1, in which it protested the
Army's decision to take corrective action to amend the solicitation in response to ArmorWorks'
protest.  AR 213.  On September 27, 2010, Ceradyne filed a second protest with the GAO,
alleging that the Army: 1) "improperly failed to evaluate the realism of the offerors' plans to
meet the delivery schedule;" 2) "improperly failed to evaluate the offerors' subcontracting
plans;" and 3) "failed to consider available and relevant information in making its affirmative
responsibility determinations."  AR 913.

Lake Coal Co. v. Roberts & Schaefer Co., 474 U.S. 120 (1985); Int'l Union v. Dana Corp., 697 F.2d 718, 721 (6th Cir. 1983)).[14]  Accordingly, the court finds the plaintiff's claim related to the government's September 2010 responsibility determinations should be dismissed.

### B.  Motions for Judgment on the Administrative Record

Because the court finds the plaintiff's claims should be dismissed for the above-stated reasons, the court does not reach the parties' motions for judgment on the administrative record.[15]

## V.   CONCLUSION

For the foregoing reasons, because the plaintiff's claim stemming from the modification of BAE's contract does not raise a viable protest under the court's bid protest jurisdiction, and because the plaintiff's claim stemming out of the Army's responsibility determinations at the time of the original procurement is moot, the defendant's and the defendant-intervenor's motions to dismiss are **GRANTED**.  The Clerk is directed to enter judgment accordingly.  No costs.

---

[14] To the extent the plaintiff challenges the government's ultimate compliance with the terms of the settlement agreement through its subsequent efforts to conduct responsibility determinations, that potential contract claim is not properly before this court as a bid protest under 28 U.S.C. § 1491(b).

[15] Having failed to succeed on the merits, the plaintiff's motion for injunctive relief is **DENIED**. See PGBA, LLC v. United States, 389 F.3d 1219, 1228-29 (Fed. Cir. 2004) (In deciding whether a permanent injunction should issue, a court considers: (1) whether, as it must, the plaintiff has succeeded on the merits of the case; (2) whether the plaintiff will suffer irreparable harm if the court withholds injunctive relief; (3) whether the balance of hardships to the respective parties favors the grant of injunctive relief; and (4) whether it is in the public interest to grant injunctive relief.).

**IT IS SO ORDERED**.

s/Nancy B. Firestone
NANCY B. FIRESTONE
Judge